Filed
D.C. Superior Court
11/24/2015 13:08PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### Civil Division

| | |
|---|---|
| FRED O. THOMPSON<br>435 20th Street, NE<br>Washington, DC 20002<br><br>*Plaintiff,*<br><br>v.<br><br>Sun Trust Bank<br>303 Peachtree Street, N.E.<br>Atlanta, Georgia 30308<br><br>Serve:<br>Patricia Wetzel, DC Registered Agent<br>1445 New York Avenue, NW<br>5th Floor<br>Washington, D.C. 20005 | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _____ 2015 CA 009163 B<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT

Comes now the Plaintiff, Fred Thompson, by and through undersigned counsel,

Leonard Bennett and Bennett & Bennett Law Group, LLC, and hereby alleges as follows:

### JURISDICTION AND VENUE

1.   Jurisdiction of this Court is founded on D.C. Code § 11-921.  The Court has subject

matter jurisdiction because this action arises under the laws of the District of Columbia,

specifically D.C. Code § 28-3905(k)(1), as well as the common law of the District of Columbia.

2.   The Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-423

because the claims asserted herein arise from Defendants' transaction of business in the District

of Columbia; contracting to supply services in the District of Columbia; causing tortious injury

in the District of Columbia as a result of an act or omission in the District of Columbia, and/or

interest in, use, or possession of real property in the District of Columbia.

**Exhibit A**

3.     Venue is proper in this Court because the claims asserted herein arose within the District of Columbia; the Plaintiff lives in the District of Columbia; the defendant does business through branches in the District of Columbia; all transactions with which this action is concerned occurred in the District of Columbia; and the injuries were inflicted upon the Plaintiff in the District of Columbia.

## THE PARTIES

4.     The Plaintiff, Fred Thompson, is over 18 years of age and is a resident of the District of Columbia.

5.     SunTrust Bank (hereafter "SunTrust" or "the bank") is a bank chartered by the State of Georgia. It is owned by SunTrust Banks, Inc., which is a registered bank holding company, also incorporated in Georgia. SunTrust Bank is operated as the retail banking subsidiary of SunTrust Banks, Inc. SunTrust Bank is a member of the Federal Reserve System, and it is insured by the Federal Deposit Insurance Corporation. Its principal place of business is at 303 Peachtree Street NE, Atlanta, Georgia, 30308. SunTrust Bank operates banking branches in a number of states, including the District of Columbia, in which it has numerous branches. The events at issue in this case entirely concern SunTrust Bank's retail branch in Capitol Hill, at 300 Pennsylvania Avenue, SE, Washington, DC.

6.     SunTrust Investment Services, Inc. is a corporation incorporated in the State of Georgia. It is owned and controlled by SunTrust Banks, Inc. and operated as a subsidiary. It is registered with the SEC, FINRA, and the District of Columbia to conduct a wide variety of broker/dealer, investment advisory, and insurance services. Its main office location is 303 Peachtree Center Ave., Suite 140, Atlanta, Georgia 30303. Upon information and belief it places licensed and/or registered employees in the brick and mortar retail branches of SunTrust Bank, and those

2

licensed and/or registered employees are technically dual employees of SunTrust Investment

Services, Inc. and SunTrust Bank.

## SUBSTANTIVE ALLEGATIONS

7.    Plaintiff Fred Thompson is an electrician with no training or experience in making

financial decisions.

8.    In March of 2014, Mr. Thompson's mother died, and Mr. Thompson received a large

sum of money from his mother's life insurance policy.

9.    On or about April, 2014, Mr. Thompson went to the Capitol Hill branch of SunTrust

Bank to deposit this money.

10.    When he arrived at the branch, he was greeted by Zoraya Vega, who upon information

and belief, held the title of "Personal Banker IV," a position, upon information and belief, that is

considered by SunTrust to be a "Licensed Banker" position.

11.    The title "Personal Banker" is a relatively recent invention.  According to the *Barron's*

*Business Guides Dictionary of Banking Terms*:

> **PERSONAL BANKER[:]** bank employee who manages a customer's accounts
> much as a BROKER [sic] manages a client's securities portfolio.  Each personal
> banker services specific customers, opens new accounts, takes loan applications,
> answers questions about other banking services, and in general acts as a personal
> financial advisor.
>
> The personal banker system was pioneered by Wachovia Bank & Trust, Winston-
> Salem, NC in the early 1980s.  It is based on RELATIONSHIP BANKING [sic], or
> the concept that banks and thrift institutions can improve their competitive position
> vis-à-vis nonbank financial institutions by channeling retail sales through highly
> trained representatives who are knowledgeable about all of their institution's
> products and services.

Thomas P. Fitch, *Barron's Business Guides: Dictionary of Banking Terms*, 344 (Irwin L. Kellner

& Donald G. Simonson, eds., 4th Ed., 2000).

3

12.   In an effort to provide holistic services, personal bankers are often required by their employers to obtain broker/dealer and/or investment advisor licenses from the Financial Industry Regulatory Authority (hereafter "FINRA") (formerly known as the National Association of Securities Dealers, Inc. ("NASD")), the self-regulatory organization set up under the authority of the Securities and Exchange Commission to regulate virtually every aspect of the securities business.  They are also often required to obtain various insurance licenses, which are issued by the states.  Since 1999, when the Gramm-Leach-Bliley Act, Pub. L. No. 106-102, 113 Stat. 1338, was passed, banks have been allowed to associate with broker/dealer and investment advisory firms, which are often in-house subsidiaries of the bank holding company.  SunTrust has such an affiliate, i.e. another subsidiary of its bank holding company; this subsidiary is called SunTrust Investment Services, Inc.  Through the use of "networking arrangements," which are contracts between these divisions, the investment services division of a bank (or any outside broker/dealer, investment advisor, or insurance agency the bank wishes to do business with) may operate from the bank's brick-and-mortar retail branches, subject to some regulations.  *See* Comptroller's Handbook: Safety and Soundness: Retail Nondeposit Investment Products, 7-9 (Office of the Comptroller of the Currency, January 2015) *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/o-rnip.pdf.

13.   It is customary for high-level personal bankers to be required to obtain securities broker/dealer, investment advisor, and insurance licenses, and it is also customary for these employees to be treated as dual employees of the retail banking and securities arms of the bank:

> A bank employee holding securities or life insurance licenses may be authorized to recommend and sell [retail nondeposit investment products ("RNDIPs")] to the bank's customers in the employee's capacity as an employee of an insurance agency or broker-dealer. These dual employees are bank employees who can also offer clients banking products such as loans, deposits, and trust accounts.  Some banks impose substantial restrictions on the type of RNDIPs dual employees are authorized

4

to recommend or sell by limiting the employees' authorized activities and licensing. Other banks may allow dual employees to offer clients a full array of both banking products and RNDIPs, as appropriate to meet the clients' needs and objectives.

*Id.* at 8-9. Upon information and belief, SunTrust engages in this dual employee practice. *See*

*Troutman v. SunTrust Bank*, 2013 WL 5657581 (D.S.C. 2013) (employment dispute between a

former private financial advisor employed by SunTrust over whether the retail bank subsidiary or

the investments subsidiary had been his primary employer).

14.   A recent employment listing posted by SunTrust for the SunTrust branch at 23rd Street

and M Street, NW, in Washington, DC, which was posted to the SunTrust corporate website,

soliciting applicants for "Personal Banker 3 or 4" positions[1] contains a description of the type of

position Ms. Vega held.  Attached as Exhibit 1.  The listing states:

> Our Branch Banking Teammates are often the first to meet new clients and the ones who start them on the path to reaching their financial goals. . . . By having a conversation, we can understand what our clients need, and can create customized product and service solutions that address them.  Our most important job as the face of SunTrust is to build a lasting relationship that help[s] us match our clients with the exact solutions they need to help them reach their financial goals.
>     * * *
> Licensed Personal Bankers (PB III or PB IV level) hold additional responsibility for sales of insurance and investment products.  Licensed PBs may hold:
> - Insurance licenses (Life, Health and/or Variable)
> - FINRA Series 6 and 63 registrations
> - Maintain appropriate continuing education requirements as required for retaining licensing and FINRA registration.
>     * * *
> In addition preferably holds insurance licenses (Life, Health and/or Variable) and FINRA Series 6 and 63 registrations.  FINRA registrations and insurance licenses (Life, Health and Annuities) must be active and maintained or must be obtained within 270 days of employment.  Will maintain continuing education coursework to keep licenses and/or registrations in active standing.  Ability to meet or exceed minimum performance standards specific to investments and insurance.

---

[1] The listing was posted on September 3, 2015 and reviewed on the internet on October 1, 2015.  It was found at https://jobs.suntrust.com/job/Washington-Personal-Banker-3-or-4-FT-%2840-Hours%29-Washington,-DC-23rd-&-M-Branch-DC-20001/285308500/.  There were many listings for this position throughout the country on SunTrust's website, and a cursory examination showed that the each listing appeared to use almost identical language.

*Id.* at Ex. 1. A Series 6 license would allow the sale of investments such as mutual funds and annuities. A Series 63 license means the holder has expertise regarding state Blue Sky law requirements.

15. These licenses and registrations come with extensive regulatory requirements under the legally binding FINRA rules (as well as those NASD rules that are still in effect; FINRA is gradually revising them into a new unified manual).[2] In order for an individual to obtain these licenses, they must pass the appropriate examination for their category of license. FINRA Rule 1230(C). Registration is compulsory. FINRA Rules 1031 and 1032. The individual cannot register him- or herself; rather their employer has to register them by filing a Form U4. FINRA Rule 1010. The form requires extensive information about the person to be registered, and fingerprints must be included, and there will be a full background check completed by the employer, who must update the form as circumstances warrant. *Id.* and FINRA Rule 3110(e). There are continuing education requirements. FINRA Rule 1250. There are extensive and complex rules regarding conduct, duties, conflicts and standards, that the registrant must abide by at all times. *See generally*, FINRA Rules Series 2000 – 3000. There are extensive and detailed provisions regarding the responsibility of employers of registered individuals to supervise their conduct under FINRA Rules Series 3000.

16. Upon information and belief, this is what "Personal Banker IV" means in this context, and this is what Ms. Vega was held out to be.

17. Ms. Vega informed Mr. Thompson, upon greeting him, that she would assist him in opening his accounts. She assured Mr. Thompson that she could handle his accounts and assist him in making suitable investments. She held herself out as having significant authority at that

---

[2] The FINRA/NASD rules may be found at https://www.finra.org/industry/finra-rules.

SunTrust branch. She offered her services to him as his financial advisor. She proceeded to open a money market account, a checking account, and a brokerage account. She also established a line of credit for him.

18. Mr. Thompson was impressed with Ms. Vega. He noted that other bank employees could not perform the services that she could perform, because she would often have to provide lower ranking employees with various authorizations in order for them to assist him. From what he knew of her and of SunTrust Bank, he felt confident that she would give him proper advice as to appropriate investments. As a working man with no prior training or experience in financial matters, he quite understandably relied upon Ms. Vega, who he perceived to be knowledgeable in the areas of finance.

19. Because Ms. Vega seemed so knowledgeable, Mr. Thompson entered into a lengthy and close banking relationship with SunTrust. This lasted several months. From April to August 2014, Ms. Vega made numerous recommendations to Mr. Thompson for the investment of his funds. In early August 2014, Ms. Vega introduced Mr. Thompson to a man named Robert Jones, whom she stated she had gotten to know during her previous employment at Wells Fargo Bank. She held Mr. Jones out as an expert in real estate investments, and she encouraged Mr. Thompson to invest in one of Mr. Jones' ventures. She was therefore vouching for, and implicitly representing, that Mr. Jones was a competent and honest counterpart with whom to negotiate. Mr. Thompson relied on Ms. Vega's recommendation and agreed to purchase a piece of real property selected by Mr. Jones.

20. On information and belief, Ms. Vega was purporting to act as a "finder." This is a practice by which bankers bring together interested parties to a transaction that those parties will

negotiate and consummate themselves. *See* 12 C.F.R. § 7.1002 (which governs the practice when national banks engage in it).

21.   On August 15, 2014, Mr. Thompson executed a sales contract presented to him by Mr. Jones for the purchase of 2715 Unicorn Lane, NW, Washington, DC.

22.   Ms. Vega notarized the agreement in her capacity as a notary.

23.   Mr. Thompson initially tendered checks to Mr. Jones $12,700.00 and later by wire transfer another $72,000.00 from one of his SunTrust accounts all of which were deposited into an account opened by Ms. Vega and represented as being an "escrow account" to hold his funds until settlement on the purchase of the aforementioned property. There were two wire transfers, one for $60,000.00 dated August 18, 2014, and the other for $12,000.00 dated August 28, 2014. Mr. Thompson transferred $84,700.00 to the alleged "escrow account," altogether.

24.   When Mr. Thompson asked Ms. Vega where she was sending the funds, she stated that the account was an escrow account maintained by an entity known as MBI Financial. When he asked who MBI Financial was, she replied she did not know, but assured him that the funds would be held in escrow. In reliance on these representations, Mr. Thompson allowed her to make the two wire transfers from his account.

25.   As soon as the money was wired into the account, it was immediately withdrawn, by one or more persons.

26.   Furthermore, Mr. Thompson contacted a real estate agent regarding the purchase of 2715 Unicorn Lane, NW, only to learn that the property had never been offered for sale and the contract seller was fictitious.

27.  Mr. Thompson went back to SunTrust to attempt to talk to Ms. Vega, only to glimpse her fleeing into the back of the building at his approach. The bank manager informed Mr. Thompson that Ms. Vega had left the premises.

28.  Mr. Thompson explained what had happened to his money, and the manager assisted him in attempting unsuccessfully to recover the wire transfer. In the process of doing so, Mr. Thompson discovered that the so-called "escrow account," was, in fact, a regular SunTrust bank account opened by Ms. Vega herself in the name of MBI Financial.

29.  Mr. Thompson was subsequently advised by the manager that the bank's legal department was conducting an investigation of the matter, and that Ms. Vega was on medical leave. At some point, SunTrust appears to have lost track of her. To date, SunTrust has refused to inform Mr. Thompson of the results of their investigation.

30.  Upon information and belief, Ms. Vega was not, at that time, licensed to undertake any banking business that could require a license, and yet, on information and belief, she was held out by SunTrust as a "Personal Banker IV," a "Licensed Banker" position, for which, as explained above, SunTrust usually requires certain insurance and FINRA licenses and/or registrations. FINRA maintains a database called BrokerCheck[3] which draws off of FINRA's Central Registration Depository and SEC's Investment Adviser [sic] Registration Depository ("IARD"), and which extends back for 10 years.[4] FINRA licensed or registered individuals must appear in this database. Ms. Vega does not appear in it. Nor does she appear in the insurance producer database, called "Licensee Look-up," which was established by SBS License Services under the auspices of the National Association of Insurance Commissioners, which is the

---

[3] BrokerCheck may be found at http://brokercheck.finra.org/.
[4] See http://www.finra.org/investors/about-brokercheck

database used by the District of Columbia Department of Insurance, Securities and Banking.[5] In addition, on information and belief, she was not licensed as a mortgage originator at that time. Under the federal S.A.F.E. Act, all mortgage originators must register with the Nationwide Mortgage Licensing System & Registry ("NMLS"), which maintains a database of all such registrants called NMLS Consumer Access.[6] According to NMLS Consumer Access, Zoraya Lizeth Vega was registered as a "Federal Mortgage Loan Originator" for precisely eight months, from October 30, 2012 through June 24, 2013, while employed by Wells Fargo Bank, N.A., in Sterling, Virginia. She has not been registered since. She was never registered while she was a SunTrust employee.

31.    As stated above, in order to be licensed by FINRA, an individual has to pass a test and meet continuing education requirements. Registration is mandatory. Only the employer can apply on the individual's behalf for registration, and the employer has continuing supervisory responsibilities concerning their licensed employee. It is impossible that SunTrust could not have known that Ms. Vega did not hold any licenses, because they were the ones who had to complete, file and maintain the paperwork that would enable her to become registered.

32.    It therefore appears that SunTrust has adopted a trade practice, at least in this instance, of leading consumers to believe, and failing to correct the resulting misimpression, that their employees have qualifications, experience and training that they do not actually have.


## COUNT I – VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT, D.C. CODE § 28-3901, *et seq.*

33.    Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

---

[5] The database may be found at https://sbs-dc.naic.org/Lion-Web/jsp/sbsreports/AgentLookup.jsp. The DC DISB's website links to it at http://disb.dc.gov/node/325112.
[6] The NMLS Consumer Access database may be found at http://www.nmlsconsumeraccess.org/.

34.   The District of Columbia Consumer Protection Procedures Act (hereafter "CPPA") is intended to reach "*all* improper trade practices." *DeBerry v. First Mortgage & Investors Corp.*, 743 A.2d 699, 700 (D.C. 1999). It provides that:

> A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District.

D.C. Code § 28-3905(k)(1)(A). Further,

> Any claim under this chapter shall be brought in the Superior Court of the District of Columbia and may recover the following remedies:
>
> (A) Treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;
> (B) Reasonable attorney's fees;
> (C) Punitive damages.
> * * *
> (F) Any other relief which the court deems proper.

D.C. Code § 28-3905(k)(2).

> Specifically, the CPPA states, in pertinent part:

> It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:
> * * *
> (e) Misrepresent as to a material fact which has a tendency to mislead;
> * * *
> (f) Fail to state a material fact if such failure tends to mislead.

D.C. Code § 28-3904. A fact is material if "a significant number of unsophisticated consumers could find the information . . . important in determining a course of action." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444-45 (D.C. 2013) (quoting *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999)). The Court of Appeals has relied on the definition of "material" from the Restatement (Second) of Torts, § 538(2):

> The matter is material [if]:
>
> (a) A reasonable man [or woman] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question; or

11

> (b) The maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his [or her] choice of action, although a reasonable man [or woman] would not so regard it.

*Saucier* at 442 (bracketed material in original).  Whether or not a fact is material is a question of fact for the jury.  *Id.* at 445.

35.   SunTrust, by holding out Ms. Vega as a "Professional Banker IV," a "Licensed Banker" position, misrepresented the qualifications, training, testing, integrity, experience, and competence of Ms. Vega in connection with her ability to advise and assist Mr. Thompson effectively with respect to his financial affairs and goals.  On information and belief, she did not have any of the licenses that this position ordinarily requires.  Licensure reflects a certain level of skill, ethics, training, experience and competence.  By holding Ms. Vega out in this position, a reasonable unsophisticated consumer, such as Mr. Thompson, would believe her to be highly qualified to serve all his banking and investment needs and to advise and assist him with financial matters.  This impression would be enhanced by the deference that Mr. Thompson observed that other employees of SunTrust showed to Ms. Vega, as well as the fact that she had to authorize those employees to undertake certain tasks.  Finally, Ms. Vega's bold and public announcement upon greeting Mr. Thompson when he entered the SunTrust branch that she could help him with all his banking and financial needs would just further have confirmed this in his mind.

36.   The very concept of "personal banking" exists to provide full banking and financial services in a holistic manner to consumers.  These days, comprehensively licensed personal bankers are a fixture at many branches of large banks.

37.   When Mr. Thompson entered SunTrust, he was simply looking for a place to deposit his money.  By holding out Ms. Vega as a highly qualified personal banker, SunTrust induced him to undertake transactions he otherwise would not have entered into.  If a reasonable

12

unsophisticated consumer, when choosing an individual to give them financial advice, is given the choice between a personal banker who is fully licensed and who has all the qualifications that ordinarily go with the position, and someone like Ms. Vega, who bore the title but did not have the qualifications, it is obvious that the consumer would chose the former. In most competent and reputable banks, especially a multi-state bank like SunTrust, the consumer would likely have gotten the former. Mr. Thompson would never have trusted Ms. Vega's advice, and would never have acted upon that advice, if he had known that she did not have the qualifications that should have gone with her job; he would have gone to another bank, or he would simply have deposited his money at SunTrust but sought advice elsewhere.

38. This misrepresentation therefore goes to the very basis of the transaction. Mr. Thompson would never have entered into a relationship with SunTrust beyond basic deposit banking if SunTrust had not held out Ms. Vega as the knowledgeable, competent and ethical answer to all of his financial needs, and then egregiously failed to supervise her actions effectively.

39. SunTrust, should, at the very least, have informed Mr. Thompson of her lack of qualifications, training, testing, integrity, experience, competence, and abilities, and of any limits placed on the tasks she could perform. They did not do so.

40. SunTrust also misrepresented the extent of the supervision it exercised over her. A licensed banker must be extensively supervised. For instance, the guidance on best practices produced for national banks by the Office of the Comptroller of the Currency regarding retail nondeposit investment products makes several suggestions. This includes careful supervision of particularly risky transactions, the use of automated surveillance and exception alert systems to flag questionable transactions, periodic inspections and reviews, mystery shopping and customer

13

call-back programs intended to check on the performance and honesty of personnel, and other measures. *See* Comptroller's Handbook: Safety and Soundness: Retail Nondeposit Investment Products, 41-45 (Office of the Comptroller of the Currency, January 2015) *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/o-rnip.pdf. As part of FINRA's holistic supervisory scheme requirements, the supplementary material to the FINRA Rules indicates that communications and correspondence should be monitored, on a risk-based basis. FINRA Rule 3110, Supplementary Material. Because of SunTrust's representations, even though Ms. Vega, on information and belief, was not licensed, SunTrust ought to be held to the same standard as it would be if she had, in fact, been licensed. Indeed, it is the responsibility of the employing bank to file the forms that procure the licenses in the first place.

41. Further, the same internal systems and controls used by the bank to comply with the FINRA requirements for licensed representatives should also have – but did not – detect and prevent Ms. Vega's negligent or wrongful conduct here.

42. Further, whether in banking procedures or in ethics, Ms. Vega was clearly poorly trained if she was not actually part of the fraud. Rather than placing Mr. Thompson's money in a proper escrow account, she placed it in an account from which someone could quickly remove the money. By inducing Mr. Thompson to enter into a relationship with Ms. Vega beyond basic depository banking, SunTrust caused him to sustain great financial damage when Ms. Vega's resulting negligence (or fraudulent conduct) allowed one or more people to remove Mr. Thompson's money.

43. By making the foregoing material misrepresentations and omissions that not only tended to mislead, but indeed misled, Mr. Thompson, SunTrust violated the CPPA.

14

## COUNT II:  VICARIOUS NEGLIGENCE

44.   Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

45.   This Count is brought in the alternative to Count VI for fraud.  It is clear that Ms. Vega was either grossly negligent and reckless, or she was part of the fraud – one or the other must be true.  In either case, SunTrust is liable.

46.   An employer will be held liable for the acts of its employees committed within the scope of their employment. *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 427 (D.C. 2006).  District of Columbia Courts have adopted the scope of employment test from Restatement (Second) of Agency § 228, which states as follows:

> (1)  Conduct of a servant is within the scope of employment if, but only if:
>   (a) It is of the kind he is employed to perform;
>   (b) It occurs substantially within the authorized time and space limits;
>   (c) It is actuated, at least in part, by a purpose to serve the master;
>            * * *
> (2)  Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Schecter* at 427-28.

47.   Ms. Vega was apparently purporting to act as a "finder."  It is quite common for banks to act in this capacity.  For instance, 12 C.F.R. § 7.1002 allows national banks "bring together interested parties to a transaction" and to "act[] as a finder[, in which case the bank] may identify potential parties, make inquiries as to interest, introduce or arrange contracts or meetings of interested parties, act as an intermediary between interested parties, and otherwise bring parties together for a transaction that the parties themselves negotiate and consummate." *See, e.g., Alaska Fur Gallery, Inc. v. First National Bank Alaska*, 345 P.3d 76, 90-92 (AK 2015); *Norwest Bank Minnesota, N.A. v. Sween Corp.*, 916 F. Supp. 1494 (D. Minn. 1996) *aff'd* 118 F.3d 1255

15

(8th Cir. 1997). The DC Court of Appeals has approved of such practices. *Howard v. Riggs National Bank*, 432 A.2d 701, 707 (D.C 1981).

48.  A finder cannot, however, as one court pointed out, engage in the following conduct: "1) Be an agent of one party or another; 2) Broker a deal while representing only one party; 3) Make false representations as to the value of or the quality of the investment; 4) Make false recommendations as to the amount that should be invested; 5) Make false representations about the success of the investment." *Alaska Fur Gallery, Inc. v. First Nat'l Bank Alaska*, 345 P.3d 76, 91 (Ak. 2015).

49.  In this case, however, SunTrust's employee, while purporting to act as a "finder," with gross negligence or recklessness, and/or with deliberate intent, transferred Mr. Thompson's money into an improper type of account that could be, and was, accessed by someone to steal his funds. She informed Mr. Thompson that the MBI Financial account, into which she was moving his money, was an escrow account, when in fact it was an ordinary account, and someone was able to steal the money that Mr. Thompson transferred into it. Her negligence is therefore imputable to the bank.

50.  There is a longstanding rule in this jurisdiction that banks are "bound to exercise ordinary care, or due diligence" when dealing with their customers, and whether they have so acted is a question of fact. *Watts v. American Security & Trust Co.*, 47 A.2d 100, 101 (D.C. 1946). It has been explained that:

> Under the laws of the District of Columbia and Maryland governing the conduct of depository banks, a bank must act according to reasonable commercial standards applicable to the business. Whether a bank has acted in a commercially reasonable manner is usually a question of fact.

*Robin Littlejohn/LAM Supply Corp. v. Provident Bank*, 357 F. Supp. 2d 45, 48-49 (D.D.C. 2004) (pointing out there are some cases in which a bank has been found to be acting in a commercially

unreasonable manner as a matter of law, including *Bank of Southern Maryland v. Robertson's Crab House, Inc.*, 389 A.2d 388, 394 (Md.Ct.Sp.App. 1978), which held that "where a bank pays the proceeds of a corporate account to a third party with no actual or apparent authority to receive such proceeds, such conduct is similarly commercially unreasonable" as a matter of law. (*Provident* at 49)).

51.     There is simply no way Ms. Vega's actions could be construed as commercially reasonable. She was acting within the scope of her employment. SunTrust Bank is liable for her negligence.

## COUNT III:  NEGLIGENT HIRING, TRAINING AND SUPERVISION

52.     Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

53.     For purposes of the tort of negligent hiring, training and supervision, the District of Columbia Court of Appeals has adopted Restatement (Second) of Agency § 213 as the standard. *Murphy v. Army Distaff Foundation*, 458 A.2d 61, 63-64 (D.C. 1983).  This standard states as follows:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
> (a) In giving improper or ambiguous orders or in failing to make proper regulations; or
> (b) In the employment of improper persons or instrumentalities in work involving risk of harm to others;
> (c) In the supervision of the activity; or
> (d) In permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Murphy* at 64. This count "is an action of direct negligence" against the Bank, and "this duty extends even to activities which sometimes are outside the scope of employment." *Id.* at 63 (quotes, brackets and ellipses omitted). "Potential recovery in tort for negligent hiring or retention of an employee is not based on *respondeat superior*, but rather on proof of negligence

17

on the part of the employer himself." *Schecter v. Merchants Home Delivery, Inc.*, 892 A.2d 415, 431 (D.C. 2006). The Court of Appeals has quoted with approval § 213 comment *g*, which states that "[o]ne who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others." *Murphy* at 64 (quoting Restatement (Second) of Torts, § 213 comment *g*).

54. The District's highest court has explained:

> One dealing with the public is bound to use reasonable care to select employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit employee. When an employer neglects this duty and as a result injury is occasioned to a third person, the employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. This principle has been applied in a variety of cases dealing with innkeepers, carriers, stores, apartment houses, and other businesses.

*Schecter* at 431 (quoting *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951)). See, for instance, *American Security Bank v. American Motorists Insurance Co.*, 538 A.2d 736, 740-41 (D.C. 1988), in which the Court of Appeals affirmed a trial court's determination that a bank was liable for not having followed commercially reasonable procedures when it paid some fraudulently written checks, and had therefore committed this tort.

55. Moreover, there is certainly a strain of case law that appears to support the notion that an extra duty of care will be imposed upon employers when they put their employees in a position to cause great damage to other people. For instance, in *Schecter*, a case in which people who were delivering washing machines were robbing the houses to which they were delivering those machines, the Court stated "[e]specially where, as in this case, the employer knows that the employee will have free and independent access into the homes of its customers, the employer has an obligation to make reasonable efforts to inquire into such employee's past employment and past record." *Schecter* at 431. Similarly, in *International Distributing Corp. v. American*

18

*Dist. Tel. Co.*, 569 F.2d 136 (D.C. Cir. 1977) two employees of a security alarm company used

their privileged access to the premises of a liquor store customer to conduct repeated robberies.

The Court stated:

> The facts on the record to date would plainly support an inference that ADT was
> negligent in its supervision of Smith and Hines. It is clear that an employer may be
> liable for negligent breach of its duty to supervise employees. An employer has a
> duty to supervise those of its employees who are privileged because of their
> employment to enter another's property. This duty extends even to activities which,
> like theft, are outside the scope of employment.
>
> On the record established to date in this case, a jury could reasonably conclude that
> ADT did not exercise reasonable care to supervise its employees. The thieves were
> able to bypass the alarm system and enter the protected premises at will, conducting
> a burglary of one of ADT's customers nearly every other day and looting IDC's store
> ten to fifteen times. A jury might conclude from these facts that the occasional spot
> checks conducted by ADT were inadequate in view of the ease with which
> employees could conduct major thefts. Consequently, the summary judgment on the
> tort counts must be reversed and the case remanded for trial.

*International Distributing Corp.* at 139-40 (citations omitted).

56. Here, SunTrust placed Ms. Vega in a privileged position with great access to, and

control or influence over, banks customers' accounts – a position in which she could do great

damage to Mr. Thompson's financial accounts – and it was incumbent upon them to select her,

train her, and supervise her very carefully. They did not do this.

57. They further acquiesced in tortious conduct committed by their employee on their own

premises with their own instrumentalities. When Mr. Thompson entered SunTrust Bank for the

first time, Ms. Vega greeted him publicly, before the entire bank, informed him that she could

manage all his financial needs. Upon information and belief she held herself out by her job title,

"Personal Banker IV," a "licensed banker" position. Indeed, by giving her this title SunTrust

held her out in this manner. As mentioned above, by virtue of her title and position, as given to

her by the Bank, she was able to induce Mr. Thompson's reliance upon her. Later, she would go

19

on to use the banks instrumentalities – its computer system – on its own premises to negligently and/or fraudulently transfer Mr. Thompson's funds.

58.  SunTrust held Ms. Vega out as someone who had higher qualifications than she actually had, and as someone who would use those qualifications, as well as the instrumentalities of the Bank, to further the customers' (including Mr. Thompson's) interest, and they acquiesced in her holding herself out in such a manner. *See* Restatement (Second) of Agency, § 213 comment *i* ("A master is subject to liability as the possessor of premises for conduct of a servant thereon, or in fact the conduct of anyone, to the continuance of which he consents after he knows or should know that such conduct contains an unreasonable risk of harm to licensees"). She was on their premises, and she was using their instrumentalities, such as their computer system, to effect transactions for Mr. Thompson. It was incumbent upon them to supervise her very carefully, closely and effectively. They did not so supervise her. She was either not competent enough or not trustworthy enough to ensure that Mr. Thompson's money went into a proper and effective escrow account instead of a regular account that could be raided. If Ms. Vega had been licensed, FINRA Rule 3110(e) would have required that "[e]ach member shall ascertain by investigation the good character, business reputation, qualifications and experience of an applicant before the member applies to register that applicant with FINRA and before making a representation to that effect on the application for registration." Even though she, upon information and belief, was not licensed, this still should be the standard for a position that is held out to the public as one that ordinarily requires licensing. SunTrust should have selected an employee who was qualified or trustworthy enough to undertake the work with which she was entrusted, and for which she was held out. They should have trained her sufficiently so she would not negligently, recklessly

or intentionally, put a customer's money in the wrong type of account, and allow it to be stolen from such account.

59.   Finally, they should have supervised her properly, so that she would either not undertake tasks for which she was not properly trained and equipped, or she would perform them under careful supervision so that errors or improper conduct could be prevented.  It is submitted that the sort of transaction that she was trying to perform – bringing two parties together to do a real estate deal – is the sort of transaction that ought to be policed especially carefully, because this sort of transaction is especially vulnerable to the sort of conduct that actually occurred.[7]  The guidance referred to above concerning best practices produced by the Office of the Comptroller of the Currency regarding retail nondeposit investment products, again, makes several suggestions.  To repeat, this includes careful supervision of particularly risky transactions, the use of automated surveillance and exception alert systems to flag questionable transactions, periodic inspections and reviews, mystery shopping and customer call-back programs intended to check on the performance and honesty of personnel, and other measures. *See* Comptroller's Handbook: Safety and Soundness: Retail Nondeposit Investment Products, 41-45 (Office of the Comptroller of the Currency, January 2015) *available at* http://www.occ.treas.gov/publications/publications-by-type/comptrollers-handbook/o-rnip.pdf. Again, as part of FINRA's holistic supervisory scheme requirements, the supplementary material to the FINRA Rules indicates that communications and correspondence should be monitored, on

---

[7] See, e.g., FINRA Rule 3110(d) ("Each member shall include in its supervisory procedures a process for the review of securities transactions that are reasonably designed to identify trades that may violation provisions of the Exchange Act, the rules thereunder, or FINRA rules prohibiting insider trading and manipulative and deceptive devices"). Even if she was not licensed, and the transaction in question was not for securities, by holding her out in a position that the public would ordinarily expect to be licensed, the bank was representing that it was supervising her in this manner. The rule declares a standard indicative of that to which the bank should be held. In addition, again, the same internal systems and controls used by the bank to comply with FINRA requirements for licensed reps should also have – but did not – detect and prevent Ms. Vega's negligent or wrongful conduct here.

a risk-based basis. FINRA Rule 3110, Supplementary Material. Again, it is submitted that, because of the banks representations, this standard should have applied even if Ms. Vega was not licensed. At any rate, if SunTrust did any of this at all, it certainly did not act on the information, and Mr. Thompson was injured as a result.

## COUNT IV: NEGLIGENT MISREPRESENTATION

60. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

61. The D.C. Court of Appeals has stated that "a plaintiff alleging negligent misrepresentations or omissions must show (1) that the defendant made a false statement or omitted a fact that [s]he had a duty to disclose; (2) that it involved a material issue; and (3) that the plaintiff reasonably relied upon the false statement or omission to his detriment." *Sundberg v. TTR Realty*, 109 A.3d 1123, 1131 (D.C. 2015) (quotes and brackets omitted).

62. By holding out Ms. Vega, on information and belief, as a "Personal Banker IV" and when on information and belief she did not meet the qualifications for such a position, and by allowing her to hold herself out that way, and by omitting to correct this misimpression, SunTrust made false statements to Mr. Thompson, and omitted to disclose facts they had a duty to disclose to him. These representations and omissions were material because Mr. Thompson would never have relied upon Ms. Vega for his financial needs if he had known that she was not properly qualified, or that she was inflating her credentials, or that she would not act competently or lawfully with respect to his financial interests. If SunTrust had never induced or acquiesced in these misimpressions, the transactions in question never would have happened. Finally, when one goes to a bank, it is ordinarily reasonable to rely on a high ranking personal banker for financial assistance and advice. Mr. Thompson did exactly this. This reasonable reliance exposed him to Ms. Vega's negligent conduct, which caused his losses.

22

## COUNT V: FIDUCIARY DUTY

63.  Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

64.  A breach of fiduciary duty may be found in the District of Columbia where a plaintiff establishes that "(1) defendant owed plaintiff a fiduciary duty; (2) defendant breached that duty; and (3) to the extent plaintiff seeks compensatory damages – the breach proximately caused an injury." *Henok v. Chase Home Finance, LLC*, 92 F. Supp. 2d 110, 120 (D.D.C. 2013) (quoting *Bode & Grenier, LLP v. Knight*, 821 F. Supp. 2d 57, 64 (D.D.C. 2011)).  Ordinarily, the depository banking relationship is a contractual relationship, and no fiduciary duty attaches to the bank. *Geiger v. Crestar Bank*, 778 A.2d 1085, 1090-91 (D.C. 2013).  The Court of Appeals has indicated that there can be "special circumstances" which give rise to "a fiduciary or special relationship" between banks and customers. *Id.* at 1095.  In *Geiger*, the Court quoted with approval *Church of Scientology Int'l v. Eli Lilly & Co.*, 848 F. Supp. 1018, 1027-28 (D.D.C. 1994).

65.  In the *Scientology* case, a public relations firm which had been working for the Church of Scientology had also been working for several pharmaceutical manufacturers. *Id.* at 1020. When those manufacturers discovered that the public relations firm was behind a campaign sponsored by the Scientologists to discredit their products, the manufacturers told the public relations firm that they would terminate their contracts unless the firm stopped representing the Scientologists. *Id.* The public relations firm terminated its contract with the Scientologists, and the Scientologists sued for breach of fiduciary duty. *Id.* The public relations firm moved for summary judgment on the fiduciary duty claim, but the court refused to grant it. *Id.* at 1028.  It explained:

> The Restatement (Second) of Torts notes that a fiduciary relation exists when one party "is under a duty to act for or give advice for the benefit of another upon matters

23

within the scope of the relation." Restatement (Second) of Torts § 874, comment *a*. To the extent that H & K held itself out to [the Scientologists] as knowledgeable in the area of public relations and promised to provide CSI with ongoing public relations and public affairs counsel, H & K appears to fit within the Restatement's broad definition of a fiduciary.

It may well be that no Court has ever found there to be a fiduciary relationship between a public relations firm and one of its clients. But whether there exists a fiduciary relationship is a fact-intensive question, involving a searching inquiry into the nature of the relationship, the promises made, the type of services or advice given and the legitimate expectations of the parties. A case from the Southern District of New York describes the outer limits of the fiduciary concept:

> Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

*Schmidt v. Bishop*, 779 F. Sup. 321, 325 (S.D.N.Y. 1991) (quoting *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 902 (2d Dept. N.Y. 1976), *appeal dismissed*, 42 N.Y.2d 908, 397 N.Y.S.2d 1004, 366 N.E.2d 1358 (1977)) (citing Restatement (2d) Torts § 874, comment *a*).

In another case from the Southern District, the Court noted that while normally a fiduciary duty would not arise from a straightforward contractual arrangement, a fiduciary relationship could exist under certain circumstances. For example, such a relationship might exist between a boxing promoter and his boxer, if the boxer could demonstrate that the promoter had violated "the very limited tissue of trust a fighter reasonably reposes in a promoter." *Don King Productions, Inc. v. Douglas*, 742 F. Supp. 741, 769 (S.D.N.Y. 1990). The existence of a fiduciary relationship would depend on whether the parties, through the past history of the relationship and their conduct, had extended the relationship beyond the limits of the contractual obligations. *Id.* at 770.

*Scientology* at 1028 (some citations and quotes omitted). "District of Columbia law has deliberately left the definition of 'fiduciary relationship' flexible, so that the relationship may change to fit new in which a special relationship of trust may properly be implied." *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 46 (D.D.C. 2010).

66.   The D.C. Court of Appeals found, when finding that the escrow agent – depositor relationship is a fiduciary relationship, "[c]ertainly there can be no question as to the existence of the fiduciary capacity in a case where the agent has been entrusted with money to be used for a specific purpose." *Wagman v. Lee*, 457 A.2d 401, 405 (D.C. 1983) (quoting *Hamby v. St. Paul Mercury Indemnity Co.*, 217 F.2d 78, 80 (4th Cir 1954)). *See also, Urban Investment, Inc. v. Branham*, 464 A.2d 93, 96-97 (D.C. 1983) (real estate brokers owe a "fiduciary duty of the 'highest fidelity' to the vendor" and under certain, special circumstances, can owe a fiduciary duty to the buyer as well).   Federally registered investment advisors have generally been found to have strong fiduciary duties. *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ("The Investment Advisers [sic] Act of 1940 thus reflects a congressional recognition of the delicate fiduciary nature of an investment advisory relationship" (quotes omitted)).

67.   The special circumstances necessary to raise this matter above the fiduciary duty threshold existed here.   The entire "personal banking" relation is designed to induce a reliance by the customer upon the banker.   As explained above, the very definition of "personal banker" involves the provision of holistic financial services.   As the *Barron's Business Guides: Dictionary of Banking Terms* stated, *supra*, a person banker "in general acts as a personal financial advisor."   SunTrust itself pointed out in its employment solicitation that personal bankers are "the face of SunTrust;" they "are often the first to meet new clients and the ones who start them on the path to reaching their financial goals;" they are to offer their customers "customized product and service solutions" to "address" their "needs;" their job is to "build a lasting relationship" with their customers.   Exhibit 1.   Ms. Vega greeted Mr. Thompson at the door, and explicitly held herself out as someone who could assist Mr. Thompson with all of his financial needs.   SunTrust held her out as "licensed banker" who could meet those needs.   For

purposes of the instant transaction, upon information and belief, Ms. Vega was purportedly acting as an intermediary, a finder, who was facilitating a real estate deal – in fact, as a finder, at the very least, she owed Mr. Thompson the duty not to favor his counterparty, and not to make false representations as to the value of or quality of an investment, the amount that should be invested, the success of the investment – or the competence and integrity of Mr. Jones. *Alaska Fur Gallery, Inc. v. First Nat'l Bank Alaska*, 345 P.3d 76, 91 (Ak. 2015). Ms. Vega even misrepresented the creation of a proper and effective escrow account, which is, after all, a trust account. SunTrust, through Ms. Vega, breached its fiduciary duty to Mr. Thompson.

## COUNT VI: FRAUD

68. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

69. This Count is brought in the alternative to Count II for vicarious negligence. It is clear that Ms. Vega was either grossly negligent and reckless, or she was part of the fraud – one or the other must be true. In either case, SunTrust is liable.

70. Common law fraud includes the following elements: "(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 438 (D.C. 2013) (quoting *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1074 n.22 (D.C. 2008)). The *Saucier* Court has explained:

> In determining whether there is a valid claim for common law fraud, we have adhered to the following legal principles. A false representation may be either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen. A misrepresentation is an assertion that is not in accord with the facts. A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so. Nondisclosure of material information may constitute fraud, especially where there is a duty to disclose. Mere silence does not constitute fraud unless there is a duty to speak.

26

*Saucier* at 438-39 (citations and quotes omitted).

71.   SunTrust is directly liable for any fraud committed by Ms. Vega. Restatement (Second) of Agency § 261 states that "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his [or her] authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Comment *a* to that section explains:

> The principal is subject to liability under the rule stated in this Section although he is entirely innocent, has received no benefit from the transaction, and, as stated in Section 262, although the agent acted solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Restatement (Second) of Agency § 261, comment *a*. In fact, the first illustration for this section is quite reminiscent of the current case:

> A, agent of the P bank, with authority to notify the drawees of bills as to the receipt of goods against which the bills are drawn, fraudulently notifies T that certain goods have been received. Upon the strength of this T pays a draft drawn by the purported shipper of the goods. P is subject to liability to T for the loss occasioned by the payment of the draft.

Restatement (Second) of Agency § 261, comment *a*, illustration 1.

72.   Section 262 of the Restatement (Second) of Agency, in turn, states that "[a] person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this." Comment *a* to this Section explains:

> A person relying upon the appearance of agency knows that the apparent agent is not authorized to act except for the benefit of the principal. This is something, however, which he normally cannot ascertain and something, therefore, for which it is rational to require the principal, rather than the other party, to bear the risk. The underlying principle based upon business expediency – the desire that third persons should be given reasonable protection in dealing with agents finds expression in many rules,

> some in situation in which there is no apparent authority (see § 161 and §199,
> Comment *a*) and many in situations in which there is apparent authority. See §§ 131
> and 171. In all of such cases the other party relies upon the honesty of the agent,
> and, if the principal is disclosed or partially disclosed, realizes that the agent is not
> authorized if fraudulent. It is, however, for the ultimate interest of persons
> employing agents, as well as for the benefit of the public, that persons dealing with
> agents should be able to rely upon apparently true statements by agents who are
> purporting to act and are apparently acting in the interests of the principal. The line
> at which the principal's liability ceases is a matter for judicial judgment.

Restatement (Second) of Agency § 262, comment *a*. The first illustration of this comment is also

reminiscent of the current case:

> P, whose business is that of advising persons concerning investments, represents to T
> that A is his manager. At P's office, T seeks advice of A concerning investments.
> A, acting solely to promote an enterprise of which he is the owner, makes deceitful
> statements in regard to it, on the strength of which T invests and loses. P is subject
> to liability to T.

Restatement (Second) of Agency § 262 comment *a*, illustration 1.

73.   Ms. Vega introduced Mr. Thompson to Mr. Jones, informing Mr. Thompson that she

had known him when they had both previously worked together at Well Fargo, and she implicitly

vouched for his expertise and integrity in real estate investment. She specifically induced him to

enter into the deal with Mr. Jones concerning 2715 Unicorn Lane, NW. She even notarized the

contract by which Mr. Thompson thought he purchased that property. She induced him to tender

checks to Mr. Jones and she assured him that she was wire transferring the bulk of the money

into an escrow account, which turned out to be a regular account she set up herself, and from

which someone was able without authorization to remove Mr. Thompson's money. As soon as

Mr. Thompson discovered what had happened he returned to the bank, only to glimpse Ms. Vega

fleeing out the back. The manager informed him that she was no longer on the premises. It

turned out that the property in question had never been for sale in the first place. It appears that

while SunTrust was investigating what had occurred, they may have lost track of Ms. Vega.

28

74. Taken together, Ms. Vega falsely and fraudulently represented Mr. Jones's skill and integrity at the very least, and induced Mr. Thompson to enter into a fraudulent deal. She also falsely represented that she was transferring Mr. Thompson's money into a proper and effective escrow account, when it was a regular account that someone could raid. These were clearly material facts that would induce a reasonable person to rely upon them, especially as to the escrow account. Ms. Vega was either grossly negligent and reckless, and thus exposed SunTrust to liability for her vicarious negligence as explained Count II, above, or she must have known that the account she was transferring Mr. Thompson's money into was not an escrow account, in which case she was part of the fraudulent scheme; there is no other explanation. And if she did know that it was not a proper and effective escrow account, it must have been for purposes of deception so that whoever could remove Mr. Thompson's money could do so. Finally, in reliance on her assertions, Mr. Thompson authorized the money to be transferred into the purported "escrow account," and because it was not actually an escrow account, all the money in it was stolen. All the elements of fraud are present. Under Restatement (Second) of Agency §§ 261 and 262, SunTrust is liable for this fraud.

## COUNT VII: CONVERSION

75. Plaintiff re-alleges all previous paragraphs as if fully set forth herein.

76. Plaintiff alleges that Ms. Vega, an agent, servant and/or employee of Defendant opened a purported escrow account for Plaintiff to effectuate the purchase of a real estate transaction.

77. Plaintiff, relying on Ms. Vega's expertise and Defendant's representation of her, transferred money to the purported escrow account, which in effect was supposed to be monies that belonged to Plaintiff until the completion of the real estate transaction.

29

78.   Upon the transfer of the monies to the purported escrow account, which were the property of Plaintiff, Ms. Vega, Defendant and/or its other agents, servants, and employees allowed the unlawful exercise and control of the escrow account and monies therein.

79.   The exercise and control of the escrow account and the monies therein denied Plaintiff his rights to the purported escrow account and the funds that Plaintiff deposited in such escrow account.

80.   Plaintiff was damaged financially by the unlawful exercise and control over Plaintiff's purported escrow account and funds.

81.   Defendant is liable for the acts and/omissions of Ms. Vega and of Defendant's, through its agent, servants, employees, for allowing the unlawful exercise and control over Plaintiff's property.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for judgment against the Defendant as follows:

A.   Treble damage, or $1,500 for every violation, whichever is greater, payable to Plaintiff for any violation of the CPPA under D.C. Code § 28-3905(k)(2)(A);

B.   Compensatory damages of at least $700,000.00;

C.   Reasonable attorney's fees and costs under D.C. Code § 28-3905(k)(2)(B); (F);

D.   Interest under D.C. Code §§ 15-108; 15-109;

E.   Punitive damages of not less than $1 million under D.C. Code § 28-3905(k)(2)(C);

F.   Consequential damages under D.C. Code § 28-3905(k)(2)(F); and

G.   Such other relief as the Court deems proper, under D.C. Code § 28-3905(k)(2)(F).


## JURY DEMAND

The Plaintiffs hereby prays for and demands a trial by jury in the above styled

30

cause of action.

Dated: November 30 2015

Respectfully submitted,

_____

Fred O. Thompson
435 20th Street, NE
Washington, DC 20002

## VERIFICATION

This 26 day of November, 2015 personally appeared before me **Fred O. Thompson**

and, after being duly sworn, stated that the factual statements to this Verified Complaint are true

and correct to the best of his knowledge, information and belief.

Notary Public

My Commission Expires: 4/14/19

Respectfully submitted,

_____

Leonard Bennett, Esq. D.C. Bar No. 979516
Bennett & Bennett Law Group, LLC.
4920 Niagara Road, Suite 206
College Park, Maryland 20740
Office: (240) 398-3140
Fax (202)379-9067
Leoanrd@bblegal.net
*Counsel for Plaintiff*